UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America,                                                        Case No. 3:21-cr-504

                        Plaintiff,

            v.                                                                    MEMORANDUM OPINION
                                                                                          AND ORDER

Jeremy Adams,

                        Defendant.

## I.    INTRODUCTION

Defendant Jeremy Adams is charged with sexual exploitation of a minor (production of child pornography), in violation of 18 U.S.C. § 2251(a).  (Doc. Nos. 1 and 10).  Adams previously moved, through counsel, to suppress evidence seized during a search of his residence in Lodi, California, as well as evidence obtained during subsequently searches of property seized during the initial search. (Doc. No. 17).  I denied that motion.  (Doc. No. 34).

Adams now is representing himself with the assistance of stand-by counsel.  (*See* non-document entry dated September 6, 2022.  He has filed a motion to dismiss the charge against him for allegedly violating the Constitution, (Doc. No. 36), a motion to dismiss for alleged prosecutorial misconduct and for a *Franks* hearing, (Doc. No. 37), and a motion to reconsider and renew his motion to suppress.  (Doc. No. 38).  I deemed those motions as filed on September 6, 2022, and set the deadline for the government's opposition brief as October 4, 2022, and for Adams' reply briefs as November 4, 2022.  (*See* non-document entry dated Sept. 6, 2022).

The government timely filed its briefs in opposition to Adams' motions on October 3, 2022. (Doc. Nos. 50, 51, and 52).  On October 26, 2022, Adams filed a motion for an extension of time, stating he had not received responses to his discovery requests and needed time to review that discovery before filing his reply briefs.  (Doc. No. 59).  Shortly thereafter, the government filed a motion for a protective order to limit the dissemination of certain discovery in the case.  (Doc. No. 61).

Adams did not object to the imposition of protections on personal or sensitive information provided in discovery, though he argued the government should not be permitted to utilize the confidentiality designation in the first instance.  (Doc. No. 65).  I granted the government's motion for a protective order and also granted Adams' motion for an extension of time to file his reply briefs, ordering that he file them "within 30 days of the date on which the government updates its discovery disclosures, consistent with the forthcoming protective order."  (Doc. No. 70 at 2).

Subsequent issues with access to the protected information were collaboratively addressed by Adams' standby counsel, counsel for the government, and the institution in which Adams is detained while awaiting trial, and Adams filed his reply briefs on April 19, 2023.  (Doc. Nos. 76 and 77).  Then, on May 8, 2023, Adams filed a 12-page "objection" to what he describes as "false facts and accusations" in this case, many of which involve Adams' version of the events preceding the issuance of the California search warrants.  (Doc. No. 82).  Two weeks later, on May 22, 2023, Adams filed a motion to expand a pretrial hearing set for May 25, 2023, to include a hearing on his motions for reconsideration and to dismiss the indictment, as well as for a hearing related to his request for pretrial release.  (Doc. No. 86).  Adams filed a second motion on the same date, seeking to prohibit the government from using the term "victim" at trial.  (Doc. No. 87).

During the May 25, 2023 pretrial, I granted the government's request for a period of 21 days in which to respond to Adams' motion for a hearing.  Further, at Adams' request, I ordered that he

file his reply brief to the government's response within 7 days after the government filed its brief. After the hearing, the parties engaged in additional efforts to ensure Adams had appropriate access to discovery in this case. Based upon the timing of the arrangements made, I ordered that Adams be granted leave until July 15, 2023, to file any additional pretrial motions or supplement his pending motions. (Doc. No. 90). I also set deadlines of June 15, 2023, for the government's briefs in opposition to Adams' motions for a hearing and regarding the use of the term "victim," and of July 1, 2023, for Adams' briefs in reply. (*Id*.).

Adams subsequently filed seven more motions: (1) a motion to adjust the pretrial motion deadline and to set a trial date, (Doc. No. 93); (2) a motion for the return of property, (Doc. No. 100); (3) a motion to renew his request for a technology expert, (Doc. No. 101); (4) a motion "to copy government withheld devices," (Doc. No. 102); (5) a second motion for a trial date and an objection to an ends of justice continuance entered on June 5, 2023, (Doc. No. 104); (6) a motion "to follow party presentation principle," (Doc. No. 110); and (7) a second motion to set an evidentiary hearing on his motion for reconsideration and a pretrial release hearing. (Doc. No. 117).

For the reasons stated below, I deny each of Adams' motions.

## II.    Background

I previously summarized the factual history of this case as follows:

On October 15, 2019, Adams walked into a coffee shop in Brentwood, California, to pick up a girl he had met online. (*See* Doc. No. 17-1). Instead, Adams was confronted by three juvenile males who had pretended to be the 14-year-old girl with whom Adams thought he had been corresponding. Adams left the coffee shop, with the three juveniles in pursuit. Eventually, the four ended up outside of a nearby elementary school. Officers from the Brentwood, California Police Department made contact with Adams and the juveniles at that location.

The juveniles told the officers that they first made contact with Adams through Tinder (an online dating networking application) a few weeks before the meeting. (*See id*.; Doc. No. 17-4 at 1-7). One of the juveniles had created a fake Tinder profile, posing as an 18-year-old girl in order to emulate the television show "To Catch A

Predator." Adams acknowledged he went to the coffee shop to meet the girl[1] he met through Tinder but told officers he thought the girl was 18 because that was the age listed on her Tinder profile. (Doc. No. 17-1 at 6).

The investigation, however, revealed this was not true.[2] After the conversation moved (at Adams' request) to an app called "Textfree," the girl told Adams she was 15 years old. (*Id.*). Adams responded that he "'kind of loved that.'" (*Id.*). Over the course of the next few weeks, Adams and the girl had multiple conversations about engaging in sexual activity. Adams told the girl he wanted her to send him a video of her saying his name to prove she was not a police officer, so the juveniles recorded their 12-year-old sister saying Adams' name and sent the video to him. Adams "required [the girl] . . . to send numerous photos" and also told her to send him nude pictures of herself. (*Id.* at 6-7).

Adams and the girl also discussed plans to meet in person and engage in sexual activity. Eventually, they agreed to meet at the Brentwood coffee shop. The juveniles had one of their friends wear a blonde wig and sit facing away from the door. Once Adams entered the coffee shop, the juveniles confronted him. Adams left. The juveniles followed him outside and ultimately to the elementary school, where the police arrived.

For reasons not reflected in the record, approximately nine months passed before Joseph Nunemaker, a detective with the Brentwood Police Department, sought a warrant for Adams' arrest. California law permits police officers to request that a judge issue a probable cause arrest warrant, known as a "Ramey" warrant. On July 21, 2020, Judge Lewis A. Davis of the Superior Court of Contra Costa County, California issued a Ramey warrant for Adams, concluding there was probable cause to believe Adams arranged to meet someone he believed to be a minor and went to the meeting place for the purpose of engaging in lewd acts, in violation of California Penal Code § 288.4(b). (Doc. No. 28 at 1-3).

A week later, on July 28, 2020, Nunemaker requested, and Judge Davis issued, a search warrant for a residential property located in Lodi, California, as well as for various electronic devices belonging to Davis or found in his possession. (*See* Doc. No. 17-1). Officers executed both warrants the following day. Adams was placed under arrest and officers seized a total of 12 electronic devices from the property, including laptop and desktop computers, external hard drives, and cell phones. (Doc. No. 17-2 at 2).

On one of the hard drives, Nunemaker located a folder titled "Pictures." Within that folder, Nunemaker found a subfolder containing photographs and videos "of a very young female in various sexual poses and performing various sexual acts" with a man who looked like Adams. Nunemaker searched the metadata of several of the files and determined the files were created in 2017 near Swanton, Ohio. (*See* Doc. No.

---

[1]  For ease of reference, I will refer to the fake persona the three juveniles created as "the girl."

[2]  The father of one of the male juveniles authorized the Brentwood Police Department to access the juvenile's cell phone and to retrieve the text message conversations between Adams and the girl. (Doc. No. 17-4 at 1).

17-4 at 8-9).  The Brentwood Police Department contacted the Homeland Security Investigations ("HSI") office located in San Francisco, California to assist with locating the female in the images and with further investigation.  HSI obtained search warrants for the 12 electronic devices and for an email account Adams maintained.  (*See* Doc. Nos. 17-2 and 17-3).

HSI located the female depicted in the files on the hard drive and determined she was 17 years old at the time the photos and videos were taken.

(Doc. No. 34 at 1-3).

### III.  ANALYSIS

### A.    MOTION TO DISMISS CHARGE AS UNCONSTITUTIONAL

Adams first argues that the § 2251(a) charge violates the First Amendment because the images arose from a consensual sexual relationship between two individuals who were over the age of consent under Ohio law.  (Doc. No. 36 at 4-5).  But Adams was not charged because he engaged in sexual conduct with someone under the age of 18, he was charged because he, admittedly, took photographs and videos of himself and "his 17-year-old girlfriend," (Doc. No. 66 at 8), engaged in what he alleges was "consensual sexual activity."  (Doc. No. 36 at 4).  Federal law prohibits this alleged conduct.  18 U.S.C. §§ 2251(a), 2256(1)-(2).  And the federal government is "perfectly free both to define minors as those under the age of majority and to determine that, notwithstanding their ability to consent to sexual conduct, minors over the age of sixteen should not be permitted to be the subject of pornography."  *United States v. Gore*, No. 1:17-CR-455, 2018 WL 454367, at *1 (N.D. Ohio Jan. 17, 2018).  *See also United States v. Stringer*, 739 F.3d 391, 396 (8th Cir. 2014) (holding the fact that a minor "was legally emancipated from her parents prior to engaging in the conduct at issue in the indictment" did not constitute a defense to a § 2251(a) because emancipation under state law did not exempt the minor from the scope of § 2256(1)'s definition of a "minor").  Adams' argument lacks merit.

Adams next contends the Supreme Court held in *New York v. Ferber*, 458 U.S. 747 (1982), that "production and distribution of pornography featuring 16 and 17 year olds was not just lawful

under federal jurisdiction, but was affirmatively constitutionally protected." (Doc. No. 36 at 6). But *Ferber* itself said no such thing and Adams has not pointed to any case in which a court adopted the holding he attempts to assign to *Ferber*.

Adams combines these two arguments into a claim that § 2251 is overbroad and also unconstitutional as applied to him. (Doc. No. 36 at 6-14). But the arguments are no more persuasive when lumped together than they are separately. Adams does not have a First Amendment right to engage in sexually explicit conduct with a person under the age of 18 for the purpose of producing a visual depiction of that conduct. *United States v. Hart*, 625 F.3d 850, 858 (6th Cir. 2011); 18 U.S.C. § 2251.

Lastly, Adams argues Congress lacks authority under the Commerce Clause to criminalize the production of visual depictions of his consensual sexual relationship with the 17-year old because he did not intend to distribute the depictions. (Doc. No. 36 at 14-24). But it is well-settled that Congress "'could rationally conclude that homegrown child pornography affects interstate commerce, and therefore Congress may regulate even purely intrastate production of child pornography and criminalize its intrastate possession.'" *United States v. Laursen*, 847 F.3d 1026, 1035 (9th Cir. 2017) (quoting *United States v. Sullivan*, 797 F.3d 623, 632 (9th Cir. 2015)). *See also United States v. Bowers*, 594 F.3d 522, 527-30 (6th Cir. 2010) (holding the "case-by-case analysis" set forth in *United States v. Corp*, 236 F.3d 325 (6th Cir. 2001), was no longer good law and that "'courts have no power to excise, as trivial, individual instances of the class'" of activities regulated by § 2251) (quoting *Gonzalez v. Raich*, 545 U.S. 1, 23 (2005)).

I conclude Adams fails to show the charge against him violates his First Amendment rights or exceeds Congress' power under the Commerce Clause. Therefore, I deny his motion to dismiss.

**B.** **MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT AND MOTION FOR RECONSIDERATION FOR SUPPRESSION MOTION**

Adams' second motion to dismiss and his motion to reconsider and renew his suppression motion revolve around many of the same arguments. Therefore, I will consider those motions together.

**1. Government Statements and Suppression Arguments**

Adams seeks a *Franks* hearing in order to challenge factual statements in the search warrant affidavits. (Doc. No. 37 at 3). He seeks to have stricken every reference in the initial search warrant to the age of the fictional girl, arguing Nunemaker failed to explicitly identify the statements as based on hearsay with the intention of misleading the magistrate who approved the search warrant. (*Id.*); (*see also* Doc. No. 77-1 at 18). He claims the affidavit contains misstatements of the text message conversation between himself and the juveniles posing as the girl, which were made with the intention of "inflam[ing] a reader's emotions." (Doc. No. 37 at 4). And he asserts he will be able to prove that he knew the girl was a front for "vigilantes" and that he went along with the conversation in order to figure out who was behind it. (*Id.* at 4-9). (*See also id.* at 5) ("Having been inundated with and forced to interact with my cyber stalkers and these types, it is easy to assess whether they are telling the truth or are a catfish. In this case, a quite sloppy catfish."); (*id.* at 7) ("[I]t is obvious that no one would believe the fake person was real."). Adams concludes "[m]ost of the important lines [in the affidavit] can be proven false just within the record, but with a *Franks* hearing nearly 80% could be proved to be either knowingly false, maliciously false or a reckless disregard for the truth, now that we have some of the evidence from the government." (*Id.* at 9).

Separately, Adams moves for reconsideration of my Memorandum Opinion and Order denying his initial suppression motion. (Doc. No. 38). Adams asserts (1) I made clear errors of law by ruling contrary to controlling Sixth Circuit caselaw, (2) there is newly discovered impeachment

evidence, and (3) my denial of his motion worked a manifest injustice because the government did not raise the inevitable discovery defense in its briefing.  (*Id.* at 5-6).

### a. *Franks* Hearing

A search warrant violates the Fourth Amendment "when the supporting affidavit contains a statement, necessary to the finding of probable cause, that is later demonstrated to be false and included by an affiant knowingly and intentionally, or with a reckless disregard for the truth." *United States v. Duval*, 742 F.3d 246, 250 (6th Cir. 2014) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).  In *Franks*, the Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155-56.  Adams, acting through retained counsel, did not request a *Franks* hearing in his initial suppression motion, (Doc. No. 34 at 4), and he fails to show now that one is warranted.

Adams argues he did not believe he actually was corresponding with a minor female and that no reasonable person would have thought so either.  (*See, e.g.,* Doc. No. 37 at 4-5).  Adams also claims the messages exchanged on TextFree were altered by the juveniles posing as the fictional girl to make it seem as though Adams said things he did not.  (Doc. No. 37 at 7).  (*See also id.* at 5) (asserting his "investigator also found that the app is extraordinarily easy to manipulate, edit and spoof with little technological skill").  He contends that "[a]fter excising maliciously false and recklessly false statements and the messages from the juvenile[s'] spoof app with no temporal reference, there is no fair probability of evidence of a crime or that contraband will be found at the Lodi residence."  (Doc. No. 77-1 at 18).

But Adams offers no evidence that Nunemaker did not actually accept the messages he obtained in his investigation as true.  *See Franks*, 438 U.S. at 165 (holding factual statements in a warrant affidavit must be "'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true").  To the contrary, evidence Adams introduced into the record offers no indication that Nunemaker was skeptical about the veracity of the messages provided to him by the juveniles posing as the fictional girl.  (*See* Doc. No. 17-4).  Adams' opposing view of the factual allegations contained in the warrant affidavit is not sufficient to demonstrate those allegations are false.

Adams has identified one apparent inaccurate factual allegation in the affidavit.  Nunemaker stated: "It was during the conversation on the text free app that the female informed ADAMS that she was 14 years old turning 15 in a month.  ADAMS responded to that information stating that he 'kind of loved that.'"  (Doc. No. 17-1 at 6).  In the message, the girl appears to tell Adams she was in high school and said, "I hope that's not bad."  (Doc. No. 32-1 at 1).  Adams replied, "Nah I kinda love it."  (*Id.*).  The girl then told Adams she actually would be turning "15 this month."  (*Id.*); (Doc. No. 17-4 at 2).

Even if I were to conclude Nunemaker's apparent mischaracterization of this conversation was knowingly or recklessly false, Adams fails to show the statement was necessary to the probable cause finding.  After the age conversation, Adams repeatedly engaged in sexual conversations with the girl, tried to get the girl to meet him in person, and asked her to send him nude pictures.  (Doc. No. 17-4 at 2-6).  Nunemaker included these facts in the warrant affidavit, and these facts were sufficient to establish probable cause to believe that Adams' personal electronic devices may contain evidence of a crime, including "depict[ions of] underage children engaging in sexually explicit activity or poses."  (Doc. No. 17-1 at 4, 6).

Adams is not entitled to a *Franks* hearing because he has not made "a substantial preliminary showing that . . . the allegedly false statement is necessary to the finding of probable cause. . . ." *Franks*, 438 U.S. at 155-56.  Therefore, I deny his request for a hearing in his motion to dismiss for prosecutorial misconduct, (Doc. No. 37 at 3), as well as his subsequent motions for a hearing.  (Doc. Nos. 86 and 117).

### b.  Reconsideration of Suppression Motion

While the Federal Rules of Criminal Procedure do not contemplate motions for reconsideration, courts "'adjudicating such motions in criminal cases typically evaluate such motions under the same standards applicable to a civil motion to alter or amend judgment'" filed pursuant to Federal Rule of Civil Procedure 59(e).  *United States v. Stamper*, No. 1:15CR109, 2018 WL 1241575, at *6 (S.D. Ohio Mar. 9, 2018) (citations omitted).  "Under Rule 59, a court may alter the judgment based on: '(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.'" *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010) (quoting *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005)).  These motions are not designed to give an unhappy litigant an opportunity to relitigate matters already decided; nor are they a substitute for appeal.  *Dana Corp. v. United States*, 764 F. Supp. 482, 488-89 (N.D. Ohio 1991).

The government argues I should deny Adams' motion for reconsideration as untimely, because he filed it more than 28 days after the entry of my Memorandum Opinion and Order denying his suppression motion.  (Doc. No. 52 at 2-3).  While Adams claims the 28-day limitation does not apply to motions for reconsideration of suppression motions, he has not pointed to any case in which a court reached that conclusion.  (Doc. No. 76-1 at 4-5).  Moreover, courts within the Sixth Circuit routinely hold that motions for reconsideration are subject to deadlines set by applicable rules of procedure.  *See, e.g., United States v. Correa-Gomez*, 328 F.3d 297, 299 (6th Cir. 2003)

(holding motion for reconsideration of a final judgment in a criminal case must be filed within the limitation period provided by Federal Rule of Appellate Procedure 4(b)); *United States v. Raheja*, No. 1:19-CR-559, 2022 WL 138082, at *9 (N.D. Ohio Jan. 14, 2022) (denying motion for reconsideration of motion for relief from prejudicial joinder as untimely because it was filed outside of Rule 59(e)'s 28-day limitation).

While Adams' motion was technically filed outside of Rule 59(e)'s 28-day limitation period, I will consider the motion as though it were timely filed due to the circumstances surrounding its filing. I denied Adams' motion to suppress on May 24, 2022, (Doc. No. 34), making the Rule 59(e) deadline June 21, 2022. But on June 8, 2022, Adams' retained attorneys sought leave to file a motion to withdraw as counsel. (*See* non-document order dated June 8, 2022). Counsel informed me that Adams desired to file a few motions *pro se* and also requested that new counsel be appointed. (*See* Doc. No. 35). Adams filed his *pro se* motion for reconsideration on June 28, 2022, 21 days after counsel first sought leave to withdraw and 8 days after counsel filed their motion to withdraw. Given the circumstances, I will consider Adams' motion for reconsideration as though it was timely filed.

My conclusion regarding Adams' request for a *Franks* hearing also relates to the second of Adams' three arguments in support of his motion for reconsideration – that there is newly discovered evidence which impeaches Nunemaker's statements in the warrant affidavit. (Doc. No. 38 at 11). As I have discussed, Adams fails to point to evidence to impeach the factual allegations necessary to support probable cause. Moreover, Adams mischaracterizes this evidence as "new." While he claims the government did not produce the underlying messages until after the initial suppression motion was filed, (Doc. No. 38 at 11), it is clear from the record that Adams had the messages before briefing was completed on the suppression motion. Adams, through retained counsel, filed an excerpt from the disclosed text messages (showing the "14 turning 15"

11

conversation did not happen in the way Nunemaker represented in the warrant affidavit) as an attachment to his reply brief in support of his motion for pretrial release.  (Doc. No. 32-1).  That brief was filed on the same day as Adams' reply brief in support of his suppression motion, but it did not contain any reference to the messages Adams admittedly had in his possession.  (*See* Doc. No. 33; Doc. No. 38 at 11).

Next, Adams argues reconsideration is necessary to prevent manifest injustice.  He contends I erred in relying on the inevitable-discovery exception to reject his argument that Nunemaker engaged in an unlawful search when he exceeded the scope of the search warrant because:

> (1) the government forfeited the argument, (2) the historical facts do not add up to a preponderance of evidence that a second lawful search would happen if the first illegal one had not, (3) the defense was prejudiced by the court acting *sua sponte* without notice or opportunity to brief the issue, (4) the lack of a lawful second search precludes the exception, (5) the [California Electronic Communications Privacy Act] precludes any possible second search, and (6) the mismatch of probable cause presented (crime of traveling to meet a minor for lewd acts) and the target search (crime of child pornography) makes inevitable discovery implausible.

(Doc. No. 38 at 5).

In rejecting Adams' argument that suppression was warranted because Nunemaker allegedly exceeded the scope of the search warrant, I wrote:

> The Sixth Circuit recognizes the inevitable-discovery exception to the rule that unlawfully-obtained evidence must be suppressed: "the inevitable-discovery exception 'applies when . . . evidence discovered during an illegal search would have been discovered during a later legal search and the second search inevitably would have occurred in the absence of the first.'"  *United States v. Chapman-Sexton*, 758 F. App'x 437, 441 (6th Cir. 2018) (quoting *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002)).

> Nunemaker sought and obtained a search warrant to seize Adams' electronic devices as part of an investigation into Adams' attempt to meet a minor female to engage in sexual activity.  That investigation had uncovered statements by Adams to the effect that he previously had engaged in conversations with people posing as teenage girls who would try to get him to say inappropriate things and then threaten to call the police unless he paid them not to call.  (Doc. No. 17-4 at 2).  And Adams repeatedly sent text messages to the girl asking her to send him photos and videos, including nude photos.  (*Id.* at 5).

> These "demonstrated historical facts" are more than sufficient to support the conclusion that the challenged evidence would inevitably have been discovered. *Keszthelyi*, 308 F.3d at 574. In other words, officers had plenty of reason to believe the files in the KKM subfolder may have originated from correspondence like what led up to the October 15, 2019 arranged meeting or might otherwise have contained child pornography. The existence of this subfolder, titled with a female name, within a folder titled "Pictures," combined with Adams' statements in the text messages, was sufficient to support a fair probability that evidence of a crime would be found in the KKM subfolder. The information supporting probable cause to search was developed before the allegedly illegal search took place. *See United States v. Cooper*, 24 F.4th 1086, 1091 (6th Cir. 2022).

(Doc. No. 34 at 10-11).

Adams' first and third arguments are related. He contends the government waived the inevitable discovery exception by not mentioning it in its opposition brief and that I violated the party-presentation principle by raising the exception *sua sponte*. (Doc. No. 38 at 7).

As Adams notes, (*id.*), the party-presentation principle provides, "as a general rule . . . the parties . . . are responsible for advancing the facts and arguments entitling them to relief." *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (citation and internal quotation marks omitted). While it is true the government did not use the phrase "inevitable discovery," the opposition brief plainly argued that the images underlying the charge in this case should not be excluded even if I concluded the initial search warrant violated the Fourth Amendment. (Doc. No. 27 at 8-12). Adams acknowledged as much, arguing "the only way these images can be included in evidence is if they fall under an exception to a warrantless search." (Doc. No. 33 at 19). The parties raised the issue, and I resolved it by applying applicable Sixth Circuit caselaw.

Adams claims "[i]f the government hasn't presented an argument or a case, it should not be considered by this Court." (Doc. No. 110 at 2). But not only does Adams fail to cite to any case in which a court agreed with his statement of the law, Adams' argument is soundly defeated by controlling Supreme Court and Sixth Circuit precedent. For instance, the Supreme Court has said: "When an issue or claim is properly before the court, the court is not limited to the particular legal

theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). *See also United States v. McReynolds*, 964 F.3d 555, 568 (6th Cir. 2020) ("'[A] court is not hidebound by the precise arguments of counsel.'") (quoting *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1581 (2020)). While the party presentation principle is a well-established precept in the law, Adams fails to show I violated that principle.

Moreover, as Adams implicitly concedes, the Sixth Circuit has not held it is reversible error for a court to raise the inevitable-discovery exception *sua sponte*. (*See* Doc. No. 38 at 7). The relevant question is whether the record in the case, as supplied by the parties, is sufficiently developed to determine whether the inevitable discovery exception was properly applied. In *United States v. Evans*, the Sixth Circuit held the record before the district court was not sufficient:

> The district court *did* rule on inevitable discovery. But the court raised the issue *sua sponte*, without developing a record sufficient for us to decide whether the relevant evidence would, in fact, have been inevitably discovered. We do not know, for example, whether any child pornography was embedded in the "text messages" and "emails" that the police were plainly authorized to search for evidence of drug trafficking or, similarly, whether their ability to search for other items, such as "names" or "contacts," would have allowed the police to inspect the phone's photo gallery. Indeed, we do not even know where on the phone the images were stored. Nor do we know whether the police would have requested a broader warrant to search for evidence of drug trafficking absent the discovery of child pornography on Evans' phone. In our view, the outcome of the inevitable-discovery analysis turns on these factual issues.

*United States v. Evans*, 780 F. App'x 340, 344 (6th Cir. 2019) (emphasis in original).

The record in this case demonstrates the pictures leading to Adams' indictment in this case would have been inevitably discovered even if Nunemaker had not opened the files during the execution of the initial search warrant. Adams repeatedly requested that the girl send him nude pictures and also stated he previously had had online conversations with people posing teenage girls who tried to get him to say inappropriate things and then extort him. (*See* Doc. No. 34 at 10-11). The files that were allegedly outside the scope of the initial warrant were contained in a subfolder

titled with a female name within a folder titled "Pictures." (*Id.* at 11). As I previously stated, "officers had plenty of reason to believe the files in the Subfolder may have originated from correspondence like what led up to the October 15, 2019 arranged meeting or might otherwise have contained child pornography." (*Id.*).

The underlying facts in the record answer the questions the *Evans* court raised. The location of the files was plainly identified, as the files were discovered during an authorized search of an electronic device for "[p]hotos depicting underage children engaging in sexually explicit activity or poses." (Doc. No. 17-1 at 3). Again, as I previously stated, "[t]he information supporting probable cause to search [for these files] was developed before the allegedly illegal search took place." (Doc. No. 34 at 11) (citing *United States v. Cooper*, 24 F.4th 1086, 1091 (6th Cir. 2022)).

Adams' objections to my application of the inevitable discovery exception are based on his view that the search warrant was invalid and that Nunemaker offered "impeachable misleading and malicious[ly] false statements." (Doc. No. 38 at 7). I already have rejected both of these reasons and Adams fails to show reconsideration of my decision is appropriate.

Finally, Adams contends there are "a few controlling 6th Circuit cases that [he] believe[s] are contrary to this honorable court's ruling." (Doc. No. 38 at 6). But Adams has not identified any case in which the Sixth Circuit reached the opposite conclusion regarding suppression on the same or substantially similar facts. Instead, he argues I reached the wrong conclusions. (*See* Doc. No. 38 at 14-33). That argument is one he must raise on appeal, not in a motion for reconsideration. *See, e.g., Fisher v. Wellington Exempted Vill. Sch. Bd. of Educ.*, 223 F. Supp. 2d 833, 850 (N.D. Ohio 2001) ("Where a party views the law in a light contrary to that of this Court, its proper recourse is not by way of a motion for reconsideration but appeal to the Sixth Circuit.") (citations and internal quotation marks omitted).

I conclude Adams fails to establish a proper basis for reconsideration of my denial of his suppression motion under Rule 59(e) and deny his motion.  (Doc. No. 38).  I also deny Adams' "motion to follow party presentation principle" to the extent this motion seeks reconsideration of my earlier decisions in this case.  (Doc. No. 110).

### 2. *Brady v. Maryland*

Adams also argues this case should be dismissed because the government failed to disclose favorable evidence related to the search warrant.  (Doc. No. 37 at 10-12).  This argument is not persuasive.

In *Brady v. Maryland,* the Supreme Court held that a criminal defendant's due process rights are violated when the prosecution suppresses "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment."  373 U.S. 83, 87 (1963).  The Supreme Court later elaborated that "favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citation and internal quotation marks omitted).  The Sixth Circuit previously has expressed skepticism that *Brady* and its progeny apply to suppression hearings.  *See, e.g., United States v. Bullock*, 130 F. App'x 706, 723 (6th Cir. 2005) ("'[I]t is hardly clear that the *Brady* line of cases applies to suppression hearings.  Suppression hearings do not determine a defendant's guilt or punishment, yet *Brady* rests on the idea that due process is violated when the withheld evidence is material either to guilt or punishment.'") (quoting *United States v. Bowie,* 198 F.3d 905, 912 (D.C. Cir. 1999)) (further citation and internal quotation marks omitted) (alteration in *Bullock*).

But even if I assume *Brady* applies generally to suppression hearings, *United States v. Taylor*, 471 F. App'x 499, 520 (6th Cir. 2012), it does not have any application in this case.  Adams acknowledges the government disclosed the allegedly favorable information (the record of the

messages he exchanged with the girl) prior to the completion of briefing on the motion to suppress. (Doc. No. 38 at 11); (*see also* Doc. No. 33). Adams cannot satisfy the foundational aspect of a *Brady* claim – suppression of favorable evidence by the government – and therefore he cannot establish dismissal is appropriate. I deny his motion on this basis. (Doc. No. 37).

### 3. Selective Prosecution

Lastly, Adams asserts this case must be dismissed as a selective prosecution, a vindictive prosecution, or both. (Doc. No. 37 at 13). Adams claims that males over the age of 18 make up the vast majority of individuals charged with violations of 18 U.S.C. §§ 2251 and 2252 and that, because he fits into both of the categories, he is part of two classes of people who have been unfairly singled out for prosecution in child pornography cases. (*Id.* at 13-14). He also alleges this case arose as a result of vindictive prosecution, as "evident from the behavior of the prosecution in this case." (*Id.* at 14).

To establish a prima facie case of selective prosecution, the defendant must show that the prosecutor has:

> single[d] out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. . . . Second, he must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the *group* which the defendant belongs to.

*United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991) (citing *Wayte v. United States*, 470 U.S. 598, 608 n.10, 609) (emphasis in *Anderson*).

While Adams offers a variety of statistics and calculations purporting to show that males over the age of 18 are unfairly singled out for prosecution in child pornography cases nationwide, he has not identified anyone outside of these two groups whom the Assistant United States Attorneys assigned to this case have decided not to prosecute in similar situations, other than the then-17-year-old female depicted in the images. (Doc. No. 77-1 at 30). And he offers no evidence at all that this

prosecution was initiated with a discriminatory purpose or that it will have a discriminatory effect on males over the age of 18.  Adams fails to meet his burden to establish a prima facie case of selective prosecution.  *Anderson*, 923 F.2d at 454.

His vindictive prosecution claim fares no better.  "A prosecutor vindictively prosecutes a person when he or she acts to deter the exercise of a protected right by the person prosecuted."  *Id.* at 453 (citing *United States v. Andrews,* 633 F.2d 449, 453-55 (6th Cir. 1980)).  While Adams claims he has a protected "First Amendment right to association in a lawful, consensual romantic relationship that lasted two years and included First Amendment protected sexual activity," (Doc. No. 37 at 14), he does not have a First Amendment right to produce images depicting a minor engaged in sexually explicit conduct.  *Hart*, 625 F.3d at 858.  Therefore, he cannot establish a prima facie case of vindictive prosecution.

### C.    MISCELLANEOUS MOTIONS

### 1.    Docket Number 87

In a document he titles "motion to prohibit use of derogatory terms," Adams seeks an order prohibiting the use of the term "victim" to refer to K.A., the then-minor female depicted in the images leading to Adams' indictment in this case.  (Doc. No. 87).  The government opposes Adams' motion but requests[3] that I permit the use of the term "alleged victim" in the event I grant the motion.  (Doc. No. 92).  While I agree with the government that federal law does not prohibit the use of the term "victim," I conclude the better practice in this case is for the parties and the court to use the term "alleged victim" instead.  Adams' motion is granted in part.

---

[3]  The government also requests I order "that solitary mention of the term 'victim' does not constitute prejudice, . . . and that the term 'victim' be permitted after presentation of the evidence and during closing arguments."  (Doc. No. 92 at 8).  I conclude it would be premature to decide these questions now and deny this portion of the government's request without prejudice.

Adams also argues I should prohibit the use of "any derogatory term" during the trial and in pretrial motion practice.  (Doc. No. 87 at 2-3).  He does not elaborate on what specific terms he proposes to include in such an order, and I have no reason to question government counsel's professionalism or to otherwise anticipate the use of derogatory terms in this case.  Therefore, I deny this portion of Adams' motion.

### 2.      Docket Number 100

Adams again moves, pursuant to Rule 41(g), for the return of certain property he contends was seized during the search of his Lodi, California residence and which he alleges has no evidentiary value and is not subject to forfeiture in this case.  (Doc. No. 100).  I previously denied Adams' first motion for the return of property, noting that "the general rule in the Sixth Circuit 'is that seized property, other than contraband, should be returned to its rightful owner <u>once the criminal proceedings have terminated,</u>'" and concluding Adams had not shown he was entitled to the return of his property at that time.  (Doc. No. 55 at 10 (quoting *United States v. Hess*, 982 F.2d 181, 186 (6th Cir. 1992)).  I also concluded Adams was not entitled to the return of his property under Rule 41(g) because he had not shown the government had unlawfully seized his property.  (Doc. No. 55 at 9-10).

Adams argues I incorrectly applied the law in denying his motion, noting Rule 41(g) also permits a person "aggrieved . . . by the deprivation of property" to file a motion for the return of that property, even in the absence of an unlawful search or seizure.  (Doc. No. 100 at 2).  But while the 1989 amendments to Rule 41 may have expanded the circumstances in which an individual may file a motion for the return of property, those amendments did not abrogate the rule as stated in *Hess* that that a defendant or other claimant is not entitled to the return of seized property while the criminal case is ongoing.  *Savoy v. United States*, 604 F.3d 929, 932 (6th Cir. 2010) ("The general rule is that seized property, other than contraband, should be returned to its rightful owner once the

criminal proceedings have terminated." (quoting *Hess,* 982 F.2d at 186) (citations and internal

quotation marks omitted).

Nor did those amendments create a right to collateral litigation regarding the return of

property during the course of criminal proceedings.  To the contrary – the United States Courts of

Appeal to have considered the question have consistently held that a cause of action for the return

of property under Rule 41(g) does not accrue until the end of the criminal proceeding.  *See, e.g.,*

*Santiago-Lugo v. United States*, 538 F.3d 23, 24 (1st Cir. 2008) (holding Rule 41(g) claim for return of

property "accrues at the end of the criminal proceeding"; *United States v. Rodriguez-Aguirre*, 264 F.3d

1195, 1212 (10th Cir. 2001) (holding under former Rule 41(e), now Rule 41(g), "that the date on

which a claimant can reasonably be expected to inquire after property that has been seized by the

United States in conjunction with criminal proceedings . . . is the date on which the criminal

proceedings against the claimant have concluded").

Further, Adams is not entitled to a hearing on this motion at this time.  He contends "'[i]t is

the government's burden to show that retention [of his property] is reasonable,'" and that he is

entitled to a hearing if the government opposes his motion.  (Doc. No. 100 at 3) (quoting *United*

*States v. Silva*, 26 F. App'x 544, 547 (7th Cir. 2001)).  But *Silva* involved a post-conviction motion for

the return of property and the Seventh Circuit, like the other circuit courts, stated the general

principle that "seized property must be returned <u>after criminal proceedings have terminated</u>."  *Silva*,

26 F. App'x at 547 (emphasis added).

Adams is not entitled to the return of his property at this time.  Therefore, I again deny his

Rule 41(g) motion.

### 3.    Docket Numbers 101 and 102

Adams moves to "renew[] his request for an investigative technology expert."  (Doc. No.

101 at 1).  While he previously withdrew this request, (*see* Doc. No. 78), he renews his request

because he believes the government falsely accused him of deleting the Text Free app from his electronic devices.  (Doc. No. 101 at 1-2).  But Adams fails to show an expert's forensic examination of his electronic devices on this matter would have any relevance to the material issues in this case.

Adams seeks to litigate the issue of whether the government can prove he used the Text Free app to communicate with the vigilantes in California.  (*Id.* at 1) (arguing "the government attempts to pin the Text Free messages on Adams, yet the government did not find evidence of those messages or even the app itself on any of his devices").  But as I stated above, Adams offers no evidence that Nunemaker did not actually accept the messages he obtained in his investigation as true.  That is the question that is relevant to Adams' motion for reconsideration and his motion for a hearing.  *Franks*, 438 U.S. at 165 (holding factual statements in a warrant affidavit must be "'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true").  Evidence of the events leading up to Adams' arrest in California will not be admitted during his trial in this case and, therefore, he fails to show there is a need for a technology expert to examine his electronic devices for the sole purpose of challenging his arrest and the subsequent search of his residence.  I deny his motion for a technology expert.

Adams also seeks to copy three hard drives and one cell phone which were seized from his California residence.  (Doc. No. 102).  He argues he is entitled to this data pursuant to Rule 16(a)(1)(E)(iii) and Rule 41(g).  (*Id.*).  Adams' Rule 41(g) argument lacks merit, for the reasons I have already set forth in this Memorandum Opinion and Order.

Rule 16 states that, "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy . . . data . . . if the item is within the government's possession, custody, or control and . . . the item was obtained from or belongs to the defendant."  Fed. R. Crim. P. 16(a)(1)(E)(iii).  The government does not contest the applicability of this subsection of Rule 16, though it describes some potential challenges in copying the imaged contents of Adams' devices.

(Doc. No. 108 at 5-7) (noting the government has digital forensic reports of several devices but not the full imaged copies and that the government has not yet been able to determine whether it can provide a sanitized copy of the contents of Adams' cell phone).

The parties agree that at least some of these devices contain contraband and Adams concedes Rule 16 does not permit contraband to be copied and distributed.  (Doc. No. 102 at 1).  *See also United States v. Kimbrough*, 69 F.3d 723, 731 (5th Cir. 1995) (noting child pornography is illegal contraband and holding that Rule 16 does not permit such contraband to be "distributed to, or copied by, the defense").  But it is unclear what Adams sees as the next step, as he states "a representative can excise those alleged contraband files in California."  (Doc. No. 102 at 1).  Rule 16 prohibits dissemination of contraband to a defendant's "representative" just as it prohibits dissemination of contraband to the Defendant himself.

I grant Adams' motion for copies of the four identified devices, (Doc. No. 102 at 1), subject to the imposition of appropriate safeguards, including the removal of any contraband.

### 4.  Docket Numbers 93 and 104

Finally, Adams moves to set a trial date a trial date within 70 days and to "adjust" the pretrial motion deadline so that the deadline "for all pretrial motions . . . is no earlier than 30 days after substantive motions are ruled upon and *Franks* and other hearings have been held and 30 days before trial is set to begin."  (Doc. No. 93); (*see also* Doc. No. 104 (requesting trial date be set within 70 days)).  It is unclear from Adams' motion what he means by "pretrial motions," and I conclude this topic is one which is better resolved during the next pretrial hearing.  The same is true for the prospective trial date, which is dependent upon the availability of counsel for the government, standby counsel for Adams, and courtroom facilities within the James M. Ashley and Thomas W. L. Ashley U.S. Courthouse, which was built in 1932 for one district judge and one senior judge and now must accommodate the trial schedules of four United States District Judges and one Magistrate

Judge, including trials in criminal cases which predate this case.  Therefore, I deny Adams' motions without prejudice.

Adams also objects to the exclusion of time under the Speedy Trial Act entered on June 5, 2023.  On that date, I entered an order which set deadlines for response and reply briefs to Adams' then pending motion, granted Adams leave until July 15, 2023, to file any additional pretrial motions or to supplement his pending motions, and also excluded time over Adams' objection.  I stated:

> I find that the ends of justice is served by granting this time outweigh the best interest of the public and the defendant in obtaining a speedy trial such that the time is excluded from the Speedy Trial Act pursuant to 18 USC §3161(h). The defendant has several pending pretrial motions that are both procedural and subject in nature. Further, the defendant requested time to review discovery, and the parties have since secured a process for that to occur. To provide the defendant adequate time to review discovery and prepare pretrial motions or supplement any currently pending motion, time is excluded.

(Doc. No. 90 at 1-2).

Despite having stated his objections on the record during the May 25, 2023 pretrial hearing, Adams again objects to this time exclusion.  But his objections are not persuasive.

Adams objects to my statement that he requested time to review discovery, contending "[t]his defendant does not request *time* to review discovery, he wants an *opportunity* to view the evidence as is his right." (Doc. No. 104 at 1) (emphasis in original).  Similarly, he claims "[t]he defendant does not request time for pretrial motion preparation."  (Doc. No. 104 at 3).  Leaving aside the impossibility of "opportunity" without "time," I discussed this very topic with Adams during the May 25 pretrial hearing, and Adams stated he needed some additional time to review discovery so that he was able to cite to the evidence produced in discovery in support of his arguments in his pending motions.  Moreover, while Adams stated during that hearing that he did not need to file any more motions, he has filed a total of <u>eight</u> additional motions since that hearing

concluded.  Adams cannot complain that a trial date has not been set while simultaneously litigating (and relitigating) nearly every primary and peripheral issue in this case.[4]

Adams fails to show the June 5, 2023 exclusion of time was improper under the Speedy Trial Act.  Therefore, I overrule his objections and deny his motion on this basis.

## IV.  CONCLUSION

For the reasons set forth above, I deny Adams' motions to dismiss and his motion for reconsideration of my denial of his motion to suppress.  (Doc. Nos. 36, 37, and 38).  I also deny his motions: to expand hearing, to adjust pretrial motion deadlines and set a trial date, for the return of his property, to appoint a technology expert, to set a trial date, to follow party presentation principle, and to set hearings.  (Doc. Nos. 86, 93, 100, 101, 104, 110, and 117).

I grant Adams' motion to preclude use of the term "victim" and order the parties to use the term "alleged victim" instead.  (Doc. No. 87).  I deny this motion to the extent it seeks to broadly prohibit the use of any undefined "derogatory" term.

Finally, I grant Adams' Rule 16 motion for copies of four identified devices, subject to the imposition of appropriate safeguards, including the removal of any contraband.  (Doc. No. 102).  I deny this motion to the extent it asserts a right to relief under Rule 41(g).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge

---

[4]  Adams previously conceded that the Speedy Trial Act "automatic[ally]" excludes time when there is a pending pretrial motion.  (Doc. No. 54 at 1).